J-S13003-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE:  ADOPTION OF E.I.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  J.C.M., FATHER | No. 3142 EDA 2016 |

Appeal from the Decree Entered September 6, 2016
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2016-A0052

| | |
|---|---|
| IN RE:  ADOPTION OF N.J.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  J.C.M., FATHER | No. 3144 EDA 2016 |

Appeal from the Decree Entered September 6, 2016
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2016-A0053

| | |
|---|---|
| IN RE:  ADOPTION OF L.C.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  J.C.M., FATHER | No. 3147 EDA 2016 |

Appeal from the Decree Entered September 6, 2016
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2016-A0054

BEFORE:  BENDER, P.J.E., LAZARUS, J., and FITZGERALD, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED MARCH 28, 2017**

J.C.M. ("Father") appeals from the decrees entered September 6, 2016, that granted the petitions filed by the Montgomery County Office of

_____

[*] Former Justice specially assigned to the Superior Court.

Children and Youth ("OCY") to involuntarily terminate his parental rights to his minor children, L.C.M. (born in October of 2013), E.I.M. (born in January of 2012), and N.J.M. (born in August of 2010), (collectively "Children"), pursuant to sections 2511(a)(1), (2), (8), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[1, 2]  After careful review of the record and applicable law, we affirm.

At the conclusion of the termination hearing on September 1, 2016, the orphans' court set forth the following findings of fact:

> This family became known to [OCY] after absconding from Bucks County Office of Children & Youth supervision related to the abuse of daughter, L.[C.]M.
>
> [Mother] and her three [C]hildren lived with her paramour in Montgomery County when son[,] [E.I.M.,] endured traumatic injuries that required his hospitalization for approximately three months.  During the criminal investigation that resulted from this incident, [Mother] was uncooperative, ultimately pleading guilty to criminal charges of endangering the welfare of [C]hildren, and lying to authorities or unsworn falsification, as well as serving approximately one year in custody at the Montgomery County Correctional Facility.
>
> [OCY] involvement started upon the hospitalization of the son[,] E[.I.]M.  The relationship between birth parents and OCY is characterized as evasive by [Father] and combative by [Mother].

---

[1] The orphans' court issued the decrees on September 1, 2016 at case numbers 3142, 3144, and 3147 EDA 2016; however, the decrees were not entered on the docket until September 6, 2016.

[2] The parental rights of the Children's mother, A.L.H. ("Mother"), were terminated by separate decrees entered on the same date.  Mother has filed separate appeals.  *See* Docket Nos. 3071, 3072, and 3073 EDA 2016.

[Father] failed to show up and participate in [the termination] hearing. He has no stable home in which to raise his three [C]hildren, nor does he have an interest in pursuing his role as their father, as evidenced by his failure to comply with the Family Service Plan, to communicate with the staff of [OCY], and his waning interest in visitation to the point of being a no-show at the last four scheduled visits with no notice that he had previously provided.

N.T. Hearing, 9/1/16, at 167-168.

On February 23, 2016, OCY filed petitions for the involuntary termination of Father's parental rights regarding each of his three Children. After hearing testimony from OCY at the termination hearing on September 1, 2016, the orphans' court issued final decrees, terminating Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (8), and (b).

On September 28, 2016, Father filed timely notices of appeal in each of the three underlying matters,[3] along with timely Pa.R.A.P. 1925(b) concise statements of errors complained of on appeal. In his brief, Father presents the following issue for our review: "Did the trial court commit an error of law and/or abuse its discretion when it terminated parental rights of a father, with limited financial means, to have his parental rights terminated by finding that he failed or refused to perform parental duties?" Father's Brief at 8.

_____

[3] The appeals at 3142, 3144 and 3147 EDA 2016 were consolidated *sua sponte* by *per curiam* order of this Court, as all of these matters involve related parties and issues. Order, 11/4/16.

We review an appeal from the termination of parental rights under the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re: R.J.T.***, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. ***Id.***; ***R.I.S.***, 36 A.3d [567,] 572 [(Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. ***Id.***; ***see also Samuel Bassett v. Kia Motors America, Inc.***, 613 Pa. 371[, 455], 34 A.3d 1, 51 (Pa. 2011); ***Christianson v. Ely***, 575 Pa. 647, [654-655,] 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. ***Id.***
>
> As we discussed in ***R.J.T.***, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. ***R.J.T.***, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. ***In re Adoption of Atencio***, 539 Pa. 161, [165,] 650 A.2d 1064, 1066 (Pa. 1994).

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012).

In termination cases, the burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re S.H.*, 879 A.2d 802, 806 (Pa. Super. 2005). We have previously stated:

> The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003) (internal quotation marks omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interest of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511; other citations omitted).

This Court must agree with only one subsection of 2511(a), in addition to section 2511(b), in order to affirm the termination of parental rights. *See*

- 5 -

*In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Herein, we review the decree pursuant to section 2511(a)(2) and (b), which provide as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> …
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> …
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the

causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Here, the orphans' court held that Father's actions and words, along with testimony presented at the termination hearing, indicated an "inability to parent to the sufficient needs of his three Children," and that Father's incapacity to parent was the basis for terminating Father's parental rights. *See* N.T. Hearing at 169. Father failed to appear at the termination hearing yet now, on appeal, attempts to argue that he "acted and performed his parental duties to the best of his ability given the circumstances and obstacles he faced." Father's Brief at 12. He avers that the Family Service Plan presented him with hurdles that he could not overcome, such as attending online parenting classes when he had no computer, and visiting with his Children who were living an hour and thirty minutes away. *Id.* at 12-13.

The record clearly belies Father's assertions. When OCY first made contact with Father in August of 2015, Father stated that he was homeless and that he was unable to care for his Children at that time. N.T. Hearing at 31-32. Father arranged, however, to meet with an OCY caseworker at his

grandmother's house and indicated that he sometimes stayed with his grandmother. *Id.* at 32. At their meeting, the caseworker reviewed with Father the Family Service Plan that it had established, which consisted of the following objectives for him: 1) to obtain and maintain appropriate housing; 2) to obtain and maintain employment; 3) to attend all doctors' appointments concerning the Children; and 4) to attend parenting classes.[4] *Id.* at 33. As of the date of the termination hearing, the only plan objective that Father had completed was finding employment.[5] *Id.* Father failed to provide proof of stable housing, had not attended any medical appointments for any of the Children, and did not participate in any parenting classes. *Id.* at 34.

Moreover, Father took no initiative between August and October of 2015 to visit with the Children and, despite his expressed interest in seeing them, he only managed to attend half of the visits scheduled thereafter by OCY. *Id.* at 36. During the first supervised visit between Father and the Children in October of 2015, OCY observed:

> Father presented as child-like.... For example, in one visit he was at Chuck E. Cheese[,] and he insisted on playing a game of basketball hoops[,] even though he told [the OCY caseworker]

---

[4] Father signed the Family Service Plan and indicated to the caseworker that he agreed to the objectives. *Id.* at 34-35.

[5] OCY received a letter from Father's employer confirming his employment; however, Father never provided any pay stubs or a budget to show how he planned to care for the Children. *Id.*

that both [E.I.M.] and [N.J.M.] were not able to do it physically. He was really enjoying it. He said he was having a really good time.

*Id.* at 37. OCY also represented to the court that Father did not have appropriate parenting skills, and that he needed to be prompted to care for the Children, *i.e.*, to take them to the bathroom,[6] and to keep them from running out of the room. *Id.* at 37-38. He was also often distracted and on his cell phone during visits. *Id.* at 38.

With respect to his failure to attend any parenting classes, Father attempts to blame his lack of compliance with this plan objective on his limited resources and the fact that he did not have a computer. However, Rebecca Wheeler ("Ms. Wheeler"), a family reunification caseworker assigned to work with Father and to assist him in achieving his plan objectives, testified that she provided Father with a lot of resources for parenting classes in the area when she met with him in September of 2015. *Id.* at 72-73. At the time, Father told Ms. Wheeler that he was not interested in physically going to a class and that he would rather take a class online. Father indicated that he had a gaming system (*i.e.*, Play Station 4) and that taking the classes online would not be an issue. *Id.* at 73-74.

After hearing the foregoing testimony, the orphans' court opined:

Parental duty requires that the parent act affirmatively with good faith interest and effort and not yield to every

---

[6] Father did not appear willing to change L.C.M.'s diapers; rather, he requested that the case worker or foster mother do so. *Id.* at 38.

problem, even in difficult circumstances. A parent must use all available resources and exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. To be legally sufficient, post-abandonment contact must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role…. *In re: Z.P.*, [] 994 A.2d 1108 [(Pa. Super. 2010)].

N.T. Hearing at 174. The court concluded that the *Z.P.* case particularly applies to Father in the instant case, and that Father's actions are "tantamount to abandonment." *Id.* The orphans' court held that OCY met its burden under section 2511(a)(2) by clear and convincing evidence. *Id.* at 175. After careful review, we conclude that the court's determinations are well supported by the record.

After we determine that the requirements of section 2511(a) are satisfied, we proceed to reviewing whether the requirements of subsection (b) are met. *See In re Adoption of C.L.G.*, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*). This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). *Id.* at 1008.

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court recently stated as follows:

[I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "intangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa.

- 10 -

1992)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Here, Father avers that Mother kept the Children from him and that he did not know where the Children were staying due to his estranged relationship with Mother. *See* Father's Brief at 18. Regardless, in support of its conclusion that termination of Father's parental rights is in the best interest of the Children, the orphans' court stated:

> [T]he testimony clearly established that although there is affection and each parent cares for the Children, the birth parents have not maintained sufficient and consistent contact and there is minimal parental bond between the Children and either birth parent…. I also find that the parental bond between [Father] and each child does not exist.

N.T. Hearing at 177-178. Moreover, when asked whether there appeared to be a bond between the Children and Father, OCY responded: "Even though [E.I.M] and [N.J.M.] were happy to see [Father], they had no difficulties separating from him and going back to their foster parent. [L.C.M.] … acted like she didn't really know who he was." *Id.* at 38.

Based on the testimony and evidence produced at the termination hearing, the orphans' court concluded:

> [T]hese birth parents have not provided a home, have not met their Children's needs, and have not maintained a consistent and strong parent-child relationship. The parent[s'] desire… to start over at this time is insufficient to meet the [C]hildren's needs for a consistent and reliable love, affection and responsibility. I conclude that the emotional needs and welfare of the [C]hildren

can best be met by terminating the parental rights of both birth parents and that the [C]hildren will not suffer a detriment as a result of termination of the parental rights of birth parents.

Therefore, I find from the evidence and testimony that termination of [Father's] … rights best serves the needs and welfare of each of the [C]hildren, and termination of the parental rights of … [Father] will not irreparably harm any of the [C]hildren.

N.T. Hearing at 178.

As there is competent evidence in the record that supports the orphans' court credibility and weight assessments regarding the Children's needs and welfare, and the absence of any bond with Father, we conclude that the court did not abuse its discretion as to section 2511(b).  *See S.P.*, 47 A.3d at 826-27.  Accordingly, we affirm the order terminating Father's parental rights to the Children.

Order affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/28/2017